**LEVI & KORSINSKY, LLP**
Adam M. Apton
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Scott Greenbaum and*
*Proposed Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALEJANDRO PIERONI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HUMANIGEN, INC., CAMERON DURRANT, and TIMOTHY MORRIS, <br><br> Defendants. | Case No. 2:22-cv-05258-WJM-AME <br><br> **MOVANT SCOTT GREENBAUM'S REPLY IN FURTHER SUPPORT OF MOTION FOR LEAD PLAINTIFF** <br><br> **MOTION DATE: November 21, 2022** |
| SCOTT GREENBAUM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HUMANIGEN, INC., CAMERON DURRANT, TIMOTHY MORRIS, and DAVE CHAPPELL, <br><br> Defendants. | Case No. 2:22-cv-06118-WJM-AME |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     ARGUMENT.......................................................................................................3

      A.     Defendants Will Point to Mr. Mailey's Investment History to Rebut the "Fraud-On-The-Market" Presumption. ..................................................3

      B.     Mr. Mailey's Legal Support Does Not Involve Similar Risks Arising from "Disproportionate" Post-Disclosure Purchases...........................6

III.    CONCLUSION..................................................................................................9

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. Vitamin Shoppe, Inc.*,
   No. 2:17-cv-6454-KM-MAH, 2018 U.S. Dist. LEXIS 69968 (D.N.J. Apr. 25,
   2018) ..................................................................................................................2

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988) ...........................................................................................3

*In re Cardinal Health, Inc. Sec. Litig.*,
   226 F.R.D. 298 (S.D. Ohio 2005) ......................................................................5

*City of Bristol Pension Fund v. Vertex Pharms., Inc.*,
   12 F. Supp. 3d 225 (D. Mass. 2014) ..................................................................4

*City of Livonia Employees' Ret. Sys. v. Wyeth*,
   284 F.R.D. 173 (S.D.N.Y. 2012) .......................................................................4

*Dodge v. Cambrex Corp.*,
   2007 U.S. Dist. LEXIS 12592 (D.N.J. Feb. 23, 2007) .......................................7

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ...........................................................................................3

*In re DVI Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008) ............................................................... 4, 8, 9

*Epstein v. Am. Res. Corp.*,
   No. 79 C 4767, 1988 U.S. Dist. LEXIS 3382 (N.D. Ill. Apr. 20, 1988) ...............5

*Erickson v. Snap*,
   No. 2:17-cv-03679-SVW-AGR, 2017 U.S. Dist. LEXIS 221050 (C.D. Cal. Sep.
   18, 2017) ............................................................................................................5

*Faris v. Longtop Fin. Techs. Ltd.*,
   Nos. 11 Civ. 3658 (SAS); 11 Civ. 3661 (SAS), 2011 U.S. Dist. LEXIS 112970
   (S.D.N.Y. Oct. 4, 2011) ......................................................................................5

*GAMCO Invs., Inc. v. Vivendi, S.A.*,
   917 F. Supp. 2d 246 (S.D.N.Y. 2013) ................................................................4

*In re JPMorgan Chase & Co. Sec. Litig.*,
　2015 U.S. Dist. LEXIS 132181 (S.D.N.Y. Sep. 29, 2015) ....................................9

*Kovaleff v. Piano*,
　142 F.R.D. 406 (S.D.N.Y. 1992).........................................................................5

*In re Lehman Bros. Sec. & ERISA Litig.*,
　Nos. 09 MD 2017 (LAK); 08 Civ. 5523 (LAK), 2013 U.S. Dist. LEXIS 13999
　(S.D.N.Y. Jan. 23, 2013) ...................................................................................10

*Levy v. Gutierrez et. al.*,
　No. 1:14-cv-443, Dkt. No. 77 (D.N.H. 2014) ......................................................4

*In re Loewen Group Securities Litigation*,
　233 F.R.D. 154 (E.D. Pa. 2005) ..........................................................................7

*In re Merck & Co., Securities Derivative & ERISA Litigation*,
　2013 U.S. Dist. LEXIS 13511 (D.N.J. Jan. 30, 2013) ..........................................8

*In re Microstrategy Sec. Litig.*,
　110 F. Supp. 2d 427 (E.D. Va. 2000)....................................................................8

*In re Petrobras Sec. Litig.*,
　104 F. Supp. 3d 618 (S.D.N.Y. 2015)....................................................................4

*Pirnik v. Fiat Chrysler Autos., N.V.*,
　327 F.R.D. 38 (S.D.N.Y. 2018).............................................................................9

*Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*,
　136 F.R.D. 658 (D. Or. 1991) ..............................................................................5

*In re Safeguard Scientifics*,
　216 F.R.D. 577 (E.D. Pa. 2003) .................................................................. 2, 5, 7

*Semerenko v. Cendant Corp.*,
　223 F.3d 165 (3d Cir. 2000) .................................................................................3

## I.      INTRODUCTION

Shareholders who purchase "a disproportionately large percentage" of stock after a "curative disclosure" cannot serve as the lead plaintiff. This is well-settled law. Joshua Mailey, the only shareholder who still opposes Dr. Scott Greenbaum's motion for lead plaintiff, purchased 95% of his Humanigen Inc. securities after learning that the U.S. Food & Drug Administration rejected the Emergency Use Application for Humanigen's lead drug candidate, lenzilumab. This fact raises a litany of questions concerning Mr. Mailey's investment decisions, not the least of which being why he bought so much stock even after the FDA's decision. These questions stand in the way of class certification and ultimately weigh heavily in favor of disqualifying him as the lead plaintiff so as not to prejudice the class at large over "unique defenses" relating solely to Mr. Mailey.

If appointed as lead plaintiff, Defendants will argue as follows at class certification: Mr. Mailey bought the vast majority of his Humanigen securities ***after*** the FDA rejected lenzilumab's EUA on September 9, 2021. This fact shows that he: 1) invested in Humanigen for reasons unrelated to lenzilumab's clinical benefit and/or prospects for FDA approval; 2) would have invested in Humanigen "regardless of the misstatement/omission"; and 3) as a result, cannot rely on the "fraud-on-the-market" presumption needed to establish the element of "reliance" for his Section 10(b) and Rule 10b-5 claims. *See*, *e.g.*, *In re Safeguard Scientifics*,

216 F.R.D. 577, 582 (E.D. Pa. 2003). Without this presumption, Mr. Mailey and the class cannot satisfy the "predominance" requirement under Rule 23(b) and will not be able to win class certification.

Whether Defendants ultimately prevail on this point is not dispositive. All that matters is that the evidence presently before the Court shows "there is *some degree of probability* that the defense might 'become a major focus' in the case.'" *Aguilar v. Vitamin Shoppe, Inc.*, No. 2:17-cv-6454-KM-MAH, 2018 U.S. Dist. LEXIS 69968, at \*13-14 (D.N.J. Apr. 25, 2018) (emphasis added). The "degree of probability" that this defense might "become a major focus" in the case is heightened by the fact that the alleged theory of fraud does not change materially after September 9, 2021, meaning that Mr. Mailey cannot credibly claim he was unaware of the fraud. Thus, it makes no difference that Humanigen's stock price remained somewhat artificially inflated after the first corrective disclosure. Defendants will focus on the fact that Mr. Mailey purchased 95% of his securities after learning that Defendants had misrepresented lenzilumab's clinical benefit and prospects for FDA approval when attacking him as an "atypical" class representative and rebutting the "fraud-on-the-market" presumption.

Mr. Mailey's legal support does not change the analysis, primarily because the cases he cites do not involve lead plaintiffs or class representatives who invested for reasons unrelated to the alleged fraud. To the contrary, the cases cited by Mr.

2

Mailey acknowledge that plaintiffs with post-disclosure purchases create risks for the class, and allow them to serve as representatives only when in the company of others so as to ensure that the class is not prejudiced.

## II.    ARGUMENT

### A.    Defendants Will Point to Mr. Mailey's Investment History to Rebut the "Fraud-On-The-Market" Presumption.

Plaintiffs must prove the element of "reliance" when establishing liability under Section 10(b) of the Exchange Act and Rule 10b-5. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). To do this in class action cases, plaintiffs must avail themselves of the "fraud-on-the-market" presumption under *Basic, Inc. v. Levinson*, 485 U.S. 224, 243 (1988), to avoid "predominance" defenses under Rule 23(b). "Under the fraud on the market theory of reliance, the court presumes (1) that the market price of the security actually incorporated the alleged misrepresentations, (2) that the plaintiff actually relied on the market price of the security as an indicator of its value, and (3) that the plaintiff acted reasonably in relying on the market price of the security." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178-79 (3d Cir. 2000). Defendants may rebut the presumption with evidence showing that, for example, "the investor would have purchased or sold the securities at that price even with full knowledge of the misrepresentation, that the investor traded in the securities based on an actual belief that the market price was

3

inaccurate, or that the investor's decision to trade was based on some factor other than the market price." *Id*. at 179 n.7.

Plaintiffs are at risk of losing the "fraud-on-the-market" presumption when "a disproportionately large percentage of the investor's purchases are made after a curative disclosure, or when a disclosure is so 'forceful' that it becomes 'unreasonable for an investor, or the market, to continue to be misled by the defendants' alleged misrepresentation." *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 204 n.13 (E.D. Pa. 2008), *aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011). This is well-settled law and has been widely acknowledged by multiple courts throughout the country.[1]

---

[1] *See*, *e.g.*, *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015) (rejecting movant because its post-corrective disclosure "transactions raise serious questions regarding [the movant's] reliance on the alleged misrepresentations and omissions"); *City of Bristol Pension Fund v. Vertex Pharms., Inc.*, 12 F. Supp. 3d 225, 235 (D. Mass. 2014) ("a plaintiff who purchased after a corrective disclosure was made would have no standing, because relying on the earlier misrepresentation would no longer be reasonable in light of the new information; furthermore, the market is assumed to have processed the correction, which would be reflected in the stock price."); *Levy v. Gutierrez et. al.*, No. 1:14-cv-443, Dkt. No. 77, p. 10 (D.N.H. 2014) ("there are circumstances under which post-disclosure purchases may defeat a fraud on the market presumption, such as when a disproportionately large percentage of the investor's purchases aremade after a curative disclosure . . .") (attached as Exhibit A); *GAMCO Invs., Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 261 (S.D.N.Y. 2013) ("[P]ost-disclosure purchases can defeat the typicality requirement for class certification when plaintiffs made a disproportionately large percentage of their purchases post-disclosure . . . ."); *City of Livonia Employees' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 178 (S.D.N.Y. 2012) ("courts have found plaintiffs who have made post-disclosure purchases to be atypical . . . when plaintiffs made a disproportionately large percentage of their purchases post-disclosure") (emphasis

Mr. Mailey's post-disclosure purchases represent 95% of his overall investment. This exceeds the level of "disproportionate" purchases made in numerous other cases where the plaintiffs were held atypical or otherwise inadequate to serve as the class representative. *See*, *e.g.*, *Erickson v. Snap*, No. 2:17-cv-03679-SVW-AGR, 2017 U.S. Dist. LEXIS 221050, at *8-10 (C.D. Cal. Sep. 18, 2017) (rejecting shareholder who purchased approximately 60% of its shares after corrective disclosure); *Faris v. Longtop Fin. Techs. Ltd.*, Nos. 11 Civ. 3658 (SAS); 11 Civ. 3661 (SAS), 2011 U.S. Dist. LEXIS 112970, at *26-28 (S.D.N.Y. Oct. 4, 2011) (disqualifying shareholders who purchased 87% of shares post-disclosure).

As presently pleaded, Defendants' alleged misrepresentations prior to September 9, 2021 are substantially similar to those dated after September 9, 2021. *Compare* Pieroni Complaint, ¶29 (description of lenzilumab) *with* Pieroni

---

added) (internal quotations omitted); *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 310 (S.D. Ohio 2005) (post-disclosure purchases "undermines any causal nexus between the Defendants' alleged misrepresentations and the resulting injury"); *In re Safeguard Scientifics*, 216 F.R.D. at 582 (lead plaintiff was subject to unique defenses because he "increased his holdings in Safeguard stock even after public disclosure of the alleged fraud"); *Kovaleff v. Piano*, 142 F.R.D. 406, 408 (S.D.N.Y. 1992) (unique defense where "plaintiffs increased their holdings of Mizlou common stock after disclosure of the alleged fraud"); *Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (plaintiff was subject to unique defense where he "continued to trade in the stock in Mentor Graphics after he learned of the alleged misrepresentations of defendants"); *Epstein v. Am. Res. Corp.*, No. 79 C 4767, 1988 U.S. Dist. LEXIS 3382, at *11-12 (N.D. Ill. Apr. 20, 1988) ("First, and most striking, is the fact that purchases of ARC securities were made in both [plaintiffs'] accounts after the alleged fraudulent information had become known.").

5

Complaint, ¶¶38, 46 (substantially similar descriptions of lenzilumab). In fact, the misrepresentations prior to and after September 9, 2021 are allegedly "false and/or misleading" for substantially the same reasons. *Compare* Pieroni Complaint, ¶32 (alleging why statements were false) *with* Pieroni Complaint, ¶¶49 (alleging same reasons why statements were false). Thus, while Humanigen's stock price remained inflated until the final corrective disclosure on July 13, 2022, Mr. Mailey cannot credibly claim that he was unaware of the fraud when he bought 95% of his overall investment after September 9, 2021.[2] He knew the FDA was "unable to conclude that the known and potential benefits of lenzilumab outweigh[ed] the known and potential risks of its use as a treatment" (*id.* at ¶33), which suggests strongly that he would have purchased Humanigen's securities regardless of Defendants' alleged misrepresentations no matter when those misrepresentations were made during the Class Period.

**B.** **Mr. Mailey's Legal Support Does Not Involve Similar Risks Arising from "Disproportionate" Post-Disclosure Purchases.**

In opposition, Mr. Mailey cited several cases in defense of his post-disclosure purchases. These cases are factually distinguishable from the matter at bar and, in

---

[2] The actions presently identify a corrective disclosure on July 13, 2022 that caused Humanigen's stock price to decline $2.38 per share. *Id.* at ¶8. By comparison, the corrective disclosure on September 9, 2021 caused a decline of $7.14 per share. *Id.* at ¶7.

6

some instances, help illustrate why Mr. Mailey is subject to a "unique defense." For example, in *Dodge v. Cambrex Corp.*, 2007 U.S. Dist. LEXIS 12592 (D.N.J. Feb. 23, 2007), the court refused to disqualify the plaintiffs over their post-disclosure purchases where there were two "schemes of fraudulent activity" alleged that entailed separate false statements and separate corrective disclosures. *Id*. at *4-5. Thus, even though each plaintiff faced "atypicality" arguments arising from their respective post-disclosure purchases, "[the plaintiffs] together [met] the typicality requirement of Fed. R. Civ. P. 23(a)." *Id*. at *22.

Unlike in *Cambrex*, the actions as presently pleaded allege one theory of fraud relating to lenzilumab's clinical benefit and prospects for FDA approval for COVID-19 patients. Thus, the import of the September 9, 2021 corrective disclosure did not wane as the Class Period elapsed, meaning that Mr. Mailey's decision to purchase 95% of his overall investment after that date provides evidence that he "would have made - and in fact did - purchase stock regardless of the fraudulent omission." *In re Safeguard Scientifics*, 216 F.R.D. at 582.

The court in *In re Loewen Group Securities Litigation*, 233 F.R.D. 154, 163-64 (E.D. Pa. 2005), similarly rejected arguments concerning post-disclosure purchases because there were other "representative plaintiffs" to protect against the potential conflicts described by the defendants. *Id*. at 163-64. There are no additional "representative plaintiffs" here, meaning that the class at large would be

subject to the "unique defenses" that Mr. Mailey faces. With the absence of additional representatives to "balance any conflicts," the decision in *Loewen* does not weaken the risks created by Mr. Mailey's "unique defense."

The decision in *In re Merck & Co., Securities Derivative & ERISA Litigation*, 2013 U.S. Dist. LEXIS 13511 (D.N.J. Jan. 30, 2013), also does not change the outcome on this issue. In that case, one of the plaintiffs that made post-disclosure purchases "made his purchases based solely on his analysis of Merck's stock price," which did not preclude him from relying on the "fraud-on-the-market" presumption. *Id*. at *45-56. The other plaintiff who purchased post-disclosure was a pension fund that similarly relied on the integrity of the market. *Id*. These two plaintiffs are substantively different than Mr. Mailey, who provided only an opaque description as to his qualifications. Dkt. No. 9-3 at p. 31, ¶2. Unlike the record testimony in *Merck*, the information provided by Mr. Mailey tends to suggest that he utilizes atypical trading strategies (such as algorithmic trading) that do not rely on the integrity of the market. *See*, *e.g.*, *In re Microstrategy Sec. Litig.*, 110 F. Supp. 2d 427, 437 (E.D. Va. 2000) (institutional investor was "atypical" because it "engage[d] in transactions far beyond the scope of what a typical investor contemplate[d]").

Finally, in *In re DVI Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008), is also readily distinguishable. In fact, the court in that case states explicitly

that, "there are certain limited circumstances under which post-disclosure purchases may defeat an investor's attempt to utilize the fraud on the market presumption, such as when a disproportionately large percentage of the investor's purchases are made after a curative disclosure, or when a disclosure is so forceful that it becomes unreasonable for an investor, or the market, to continue to be misled by the defendants' alleged misrepresentation." *Id*. at 204 n.13 (internal quotations omitted). The court then goes on to specify that the plaintiffs' post-disclosure purchases were ***not*** a disproportionately large percentage of the overall holdings: "Neither is the case here. Lead Plaintiff's post-disclosure purchases made up a relatively small percentage of their overall holdings, and the partial disclosures, which were made over time, were not particularly forceful." *Id*. Consequently, the post-disclosure purchases made by the plaintiffs in *DVI* were not "disproportionately large" to their overall investments, such as the case here.[3]

## III.    CONCLUSION

Mr. Mailey's trading history will undermine any attempt he makes at triggering the "fraud-on-the-market" presumption at the class certification stage. The

---

[3] Mr. Mailey footnotes two additional cases in his opposition brief: *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018), and *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 U.S. Dist. LEXIS 132181, at *13 (S.D.N.Y. Sep. 29, 2015). However, these cases are also unpersuasive. In each one, the court faulted the defendants for not properly raising or supporting their arguments concerning the post-disclosure purchases and thus appeared to have rejected them predominantly on procedural grounds.

risks this poses for the class at large are untenable and not necessary, "as there is no reason to subject the class to the effect of this potential defense where there is another proposed class representative that is not subject to it." *In re Lehman Bros. Sec. & ERISA Litig.*, Nos. 09 MD 2017 (LAK); 08 Civ. 5523 (LAK), 2013 U.S. Dist. LEXIS 13999, at *17 (S.D.N.Y. Jan. 23, 2013) (internal quotations omitted). For the reasons stated herein, the Court should deny Mr. Mailey's motion and instead appoint Dr. Greenbaum as the lead plaintiff and his counsel as lead counsel.

Dated: November 14, 2022                    Respectfully Submitted,

**LEVI & KORSINSKY, LLP**

By: s/ Adam M. Apton
Adam M. Apton
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Scott Greenbaum and
Proposed Lead Counsel for the Class*

10