POMERANTZ LLP
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com

*Counsel for Movant Joshua Mailey and
Proposed Lead Counsel for the Class*

[Additional counsel on signature page.]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALEJANDRO PIERONI, Individually and on Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>                 v.<br><br>HUMANIGEN, INC., CAMERON DURRANT, and TIMOTHY MORRIS,<br><br>                          Defendants. | Case No. 2:22-cv-05258-WJM-AME<br><br>REPLY MEMORANDUM OF LAW: (1) IN FURTHER SUPPORT OF MOTION OF JOSHUA MAILEY FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL; AND (2) IN OPPOSITION TO COMPETING MOTION<br><br>Motion Date: November 21, 2022 |
| SCOTT GREENBAUM, Individually and on Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>                 v.<br><br>HUMANIGEN, INC., CAMERON DURRANT, TIMOTHY MORRIS, and DALE CHAPPELL,<br><br>                          Defendants. | Case No. 2:22-cv-06118-WJM-AME |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................1

ARGUMENT .........................................................................................................5

    I.     The Timing of Mailey's Humanigen Investments Do Not
           Render Him Atypical or Subject to Unique Defenses .........................5

    II.    Mailey Did Not Employ "Atypical Investment Strategies".................10

    III.   Mailey's Representation by Two Law Firms Is Irrelevant to His
           Adequacy ....................................................................................12

CONCLUSION ....................................................................................................13

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Cty. Emps. Ret. Sys. v. Energy Transfer LP*, No. 20-200,
2020 U.S. Dist. LEXIS 27788 (E.D. Pa. Feb. 18, 2020) ...........................4, 5, 12

*Dodge v. Cambrex Corp.*, No. 03-cv-4896 (PGS).,
2007 U.S. Dist. LEXIS 12592 (D.N.J. Feb. 23, 2007) ........................................6

*Eichenholtz v. Verifone Holdings, Inc.*,
2008 U.S. Dist. LEXIS 64633 (N.D. Cal. Aug. 22, 2008) ..................................9

*Hoxworth v. Blinder, Robinson & Co.*,
980 F.2d 912 (3d Cir.1992) .................................................................................6

*In re Diagnostic Ventures, Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008)......................................................................2, 7

*In re JPMorgan Chase & Co. Secs. Litig.*,
2015 U.S. Dist. LEXIS 132181 (S.D.N.Y. Sept. 29, 2015) ...............................7

*In re Loewen Group, Inc. Sec. Litig.*,
233 F.R.D. 154 (E.D. Pa. 2005)......................................................................2, 6

*In re Merck & Co., Sec. Derivative & ERISA Litig.*, MDL No. 1658
(SRC),
2013 U.S. Dist. LEXIS 13511 (D.N.J. Jan. 30, 2013)....................................2, 6

*Kanefsky v. Honeywell Int'l Inc.*, No. 18-cv-15536,
2020 U.S. Dist. LEXIS 227046 (D.N.J. Dec. 3, 2020) (Martini, J.) ..............4, 12

*OFI Risk Arbitrages v. Cooper Tire and Rubber Co.*,
63 F. Supp. 3d 394 (D. Del. 2014)....................................................................12

*Pirnik v. Fiat Chrysler Autos., N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) ..........................................................................7

*Roby v. Ocean Power Techs.*, No. 14-cv-3799 (FLW) (LHG) *et al.*,
2015 U.S. Dist. LEXIS 42388 (D.N.J. Mar. 17, 2015) ....................................11

*Roofers' Pension Fund v. Papa*,
   No. 16-2805, 2017 U.S. Dist. LEXIS 64264 (D.N.J. Apr. 27, 2017) ............1, 11

*Sayce v. Forescout Techs.*, No. 20-cv-00076-SI,
   2020 U.S. Dist. LEXIS 217198 (N.D. Cal. Nov. 19, 2020) ...........................3, 10

## Statutes

15 U.S.C. § 78u-4.........................................................................................1

PSLRA .............................................................................................*passim*

## Rules

Fed. R. Civ. P. 23 ................................................................2, 6, 12, 13

Movant Mailey[1] respectfully submits this reply memorandum of law in support of his motion for consolidation, appointment as Lead Plaintiff and approval of his selection of Pomerantz as Lead Counsel (Dkt. No. 9); and in opposition to the competing motion of Greenbaum (Dkt. No. 7).[2]

## **PRELIMINARY STATEMENT**

The PSLRA requires a court to adopt a rebuttable presumption that "the most adequate plaintiff . . . is the person or group of persons that . . . has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii). This presumption can *only* be rebutted by *proof* that the movant with the largest financial interest is atypical or inadequate. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Mere speculation or innuendo is insufficient to rebut this presumption. *See*, *e.g.*, *Roofers' Pension Fund v. Papa*, No. 16-2805, 2017 U.S. Dist. LEXIS 64264, at *13 (D.N.J. Apr. 27, 2017) (rejecting competing movant's "speculative" challenge to presumptive lead plaintiff, finding it unsupported by "any substantiated allegation").

Here, as discussed at length in Mailey's opposition brief (Dkt. No. 15), Mailey is plainly the movant with the largest financial interest in this litigation, having

---

[1] All capitalized terms herein are defined in Mailey's moving or opposition briefs, unless otherwise indicated. *See* Dkt. Nos. 9-2, 15.

[2] Initially one other putative Class member, Motwani, also filed a competing motion seeking appointment as Lead Plaintiff. Dkt. No. 8. Motwani has made no further submissions in support of her motion since her original filings on the motion deadline and appears to have abandoned her motion.

incurred a loss of approximately *$4.99 million* in connection with the Defendants' alleged fraud.  The only competing movant, Greenbaum, incurred a significantly smaller loss of only $814,701.  Mailey has also made the requisite *prima facie* showings of adequacy and typicality under Rule 23.

In opposition to Mailey's motion, Greenbaum musters only three unavailing arguments.  First, Greenbaum claims that Mailey is subject "to a 'unique defense' concerning his 'reliance' on the alleged fraud" because he purchased the majority of his shares of Humanigen securities after the first corrective disclosure alleged in the Complaints in the related actions, which occurred on September 9, 2021.  Dkt. No. 14 at 7.  However, in fraud cases involving multiple corrective disclosures, courts routinely appoint as Lead Plaintiffs investors who purchased securities after one or more such disclosures.  *See*, *e.g.*, *In re Loewen Group, Inc. Sec. Litig.*, 233 F.R.D. 154, 163 (E.D. Pa. 2005); *In re Merck & Co., Sec. Derivative & ERISA Litig.*, MDL No. 1658 (SRC), 2013 U.S. Dist. LEXIS 13511, at *43-46 (D.N.J. Jan. 30, 2013); *In re Diagnostic Ventures, Inc. Sec. Litig.*, 249 F.R.D. 196, 203-204 (E.D. Pa. 2008). Tellingly, **Greenbaum himself** filed a Complaint expressly alleging that, after September 9, 2021, "[d]espite [the resulting] decline in the Company's stock price, Humanigen securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding lenzilumab's clinical and commercial prospects"—*i.e.*, that

2

Humanigen investors who purchased securities after September 9, 2021 were indeed defrauded by Defendants. *Greenbaum* Dkt. No. 1 ¶ 38. Nor is there anything "unique" about Mailey's having purchased shares after September 9, 2021, as Greenbaum's position would effectively exclude all other investors who purchased securities in the ten months between September 9, 2021 and the end of the Class Period on July 12, 2022, a period of time which comprises nearly **75%** of the Class Period. Mailey respectfully submits that Greenbaum's readiness to take a position detrimental to the interests of so many Class members merely to secure a leadership role in this litigation calls into question his fitness to serve as a fiduciary, a role that will require him to place the interests of the Class above his own. Conspicuously, Greenbaum never raised this issue in his motion papers, but only adopted this argument after reviewing the competing motion papers—*i.e.*, after learning that Mailey had alleged a larger loss than Greenbaum. Finally, contrary to Greenbaum's assertion, the fact that Mailey purchased securities both before and after the September 9, 2021 corrective disclosure—unlikely Greenbaum, who only purchased before September 9, 2021—makes Mailey better suited than Greenbaum to represent the interests of all Class members, given that he incurred losses in connection with both of the alleged corrective disclosures. *See Sayce v. Forescout Techs.*, No. 20-cv-00076-SI, 2020 U.S. Dist. LEXIS 217198, at *18 (N.D. Cal. Nov. 19, 2020) (finding "that the class would be best represented by lead plaintiffs who also

3

purchased securities during the earlier portion of the class period" as well as during the later portion of the class period).

Second, Greenbaum speculates that Mailey "routinely employs atypical investment trading strategies . . . *e.g.*, algorithmic trading[,]" based solely on the fact that Mailey has attested to "work[ing] in technology application support of a technology company in banking." Dkt. No. 14 at 3. Greenbaum's blatant speculation falls well short of the high standard of "proof" required to rebut the presumption in favor of Mailey's appointment. There is nothing in the record to support Greenbaum's conclusion that Mailey employed "atypical investment trading strategies" or "algorithmic trading" in connection with his Humanigen investments.

Third, Greenbaum argues that Mailey's retention of "two different firms to represent him . . . suggest that he is ill-equipped to serve as the lead plaintiff in this lawsuit." Dkt. No. 14 at 4. Not so. Courts routinely approve leadership structures in PSLRA actions involving two or more firms. *See*, *e.g.*, *Kanefsky v. Honeywell Int'l Inc.*, No. 18-cv-15536, 2020 U.S. Dist. LEXIS 227046, at *8 (D.N.J. Dec. 3, 2020) (Martini, J.) (approving leadership structure comprised of two firms as co-lead counsel); *Allegheny Cty. Emps. Ret. Sys. v. Energy Transfer LP*, No. 20-200, 2020 U.S. Dist. LEXIS 27788, at *23-24 (E.D. Pa. Feb. 18, 2020) (same). Here, Mailey has designated one firm, Pomerantz, as his proposed Lead Counsel, while a second firm, The Schall Law Firm ("Schall"), has advised him regarding the process

4

of his participation in this litigation as a potential lead plaintiff and will continue to so as the litigation progresses. The involvement of two law firms in non-overlapping roles does not render Mailey inadequate nor otherwise weigh against his appointment as Lead Plaintiff.

For the foregoing reasons, Mailey respectfully requests that the Court grant his motion in its entirety and deny Greenbaum's competing motion.

## ARGUMENT

### I.    The Timing of Mailey's Humanigen Investments Do Not Render Him Atypical or Subject to Unique Defenses

Greenbaum argues that the fact that Mailey purchased Humanigen securities after the first alleged corrective disclosure of September 9, 2021 subjects Mailey "to a 'unique defense' concerning his 'reliance' on the alleged fraud, a necessary element of the Section 10(b) and Rule 10b-5 claims asserted against Defendants." Dkt. No. 14 at 7. Accordingly, Greenbaum suggests that "Mr. Mailey's decision to purchase Humanigen stock after September 9 shows he was aware of the alleged fraud and, therefore, did not rely on and was not misled by Defendants' alleged fraudulent statements." *Id.* at 3.

As a threshold matter, Mailey respectfully submits that Greenbaum's argument is difficult to credit, given that *Greenbaum himself* filed a Complaint *expressly* alleging that after September 9, 2021, "[d]espite [the resulting] decline in the Company's stock price, Humanigen securities continued trading at artificially

5

inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding lenzilumab's clinical and commercial prospects." *See Greenbaum* Dkt. No. 1 ¶ 38.  Greenbaum changed tack and began suggesting that investors who purchased after the September 9, 2021 disclosure did so with knowledge of the Defendants' alleged fraud only ***after*** he reviewed Mailey's own trading history—*i.e.*, after Greenbaum perceived an advantage to raising this argument in his efforts to secure a leadership role in this Action.

Even crediting Greenbaum's sincerity, his argument fails as a matter of law. In cases involving multiple corrective disclosures, courts routinely appoint lead plaintiffs who, like Mailey, purchased securities after one or more corrective disclosures, finding that "proposed class representatives who purchased shares mid-stream, *i.e.*, during the course of a series of disclosures may satisfy the typicality test" of Rule 23.  *Dodge v. Cambrex Corp.*, No. 03-cv-4896 (PGS)., 2007 U.S. Dist. LEXIS 12592, at *21 (D.N.J. Feb. 23, 2007).  *See also Loewen*, 233 F.R.D. at 163 (rejecting the argument that class representatives who purchased all of their shares after a partial curative disclosure were subject to unique defenses); *Merck*, 2013 U.S. Dist. LEXIS 13511, at *43-46 ("the post-disclosure purchases by [plaintiffs] have 'no bearing on whether or not [they] relied on the integrity of the market during the class period.'") (quoting *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923

6

(3d Cir.1992)); *Diagnostic Ventures*, 249 F.R.D. at 203-04 (finding that "post-disclosure purchases will not prevent an investor from relying on the integrity of the market for pre-disclosure purchases").[3]   When a security trades in an efficient market, its price is presumed to reflect all available information.  Accordingly, the Defendants' alleged false and misleading positive statements regarding the approval prospects for and commercial viability of lenzilumab artificially inflated Humanigen's share price, whereas the corrective disclosures alleged in the Complaints *each* removed some measure of that artificially inflation.  Accordingly, even after the disclosure of September 9, 2021 regarding lenzilumab's risk-benefit profile in the context of EUA approval, Humanigen shares continued to trade at artificially inflated prices because the truth about the drug's efficacy as a treatment, as measured by its statistical significance on the primary endpoint of the ACTIV/BET-B study, had yet to reach the market.

As discussed in Mailey's opposition brief, each of the two disclosures regarding Humanigen's lenzilumab product related to a different issue.  The first

---

[3] See also *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018) (objection that plaintiff was atypical because he purchased additional shares after a partial corrective disclosure was "without merit because [the plaintiff's] purchase was before the final corrective disclosure"); *In re JPMorgan Chase & Co. Secs. Litig.*, 2015 U.S. Dist. LEXIS 132181, at *13 (S.D.N.Y. Sept. 29, 2015) ("Defendants do not cite a single case—nor is this Court aware of one—holding that a lead plaintiff seeking class certification in a securities fraud suit fails to establish adequacy or typicality where that plaintiff made securities purchases after an alleged partial corrective disclosure but before the final corrective disclosure.").

disclosure of September 2021 concerned the drug's risk-benefit profile. Specifically, on September 9, 2021, Humanigen announced that the FDA had "declined [the Company's] request for emergency use authorization of lenzilumab to treat newly hospitalized COVID-19 patients," "stat[ing] that it was unable to conclude that the known and potential benefits of lenzilumab outweigh the known and potential risks of its use as a treatment[.]" Dkt. No. 11 ¶ 33. By contrast, the second disclosure of July 12, 2022 came when Humanigen disclosed that lenzilumab had failed to show statistical significance on the primary endpoint of the ACTIV/BET-B study—that is, that by the result measured at the end of the study in question, lenzilumab had not demonstrated that it worked as a treatment. *Id.* ¶ 50. The September 2021 disclosure, then, merely concerned the FDA's assessment of lenzilumab's risk-benefit profile for purposes of EUA approval and would have contained no information that would have alerted an investor to any issues regarding statistical significance on the primary endpoint of the ACTIV-5/BET-B study—the subject of the July 2022 disclosure.

Greenbaum's suggestion that any investor who purchased Humanigen securities after September 9, 2021 "was aware of the alleged fraud" (Dkt. No. 14 at 3) thus effectively conflates two distinct issues with separate relevance to lenzilumab's approval prospects. Mailey respectfully submits that Greenbaum's wholesale conflation of these distinct issues significantly undercuts his claim that,

8

as a medical doctor, he possesses "particular subject-matter knowledge about the drug at issue" that makes him "uniquely qualified to pursue a securities fraud claim that will inherently involve technical and sophisticated medical information concerning Humanigen's statements about lenzilumab."  Dkt. No. 14 at 4, 13.

Finally, Mailey is far from "unique" in having purchased Humanigen securities after the September 9, 2021 corrective disclosure.  The Class Period in this litigation encompasses the 410 days between May 28, 2021 and July 12, 2022.  The corrective disclosure of September 9, 2021 occurred only 104 days into the Class Period, meaning that barely 25% of the Class Period had elapsed by the time of the September 9, 2021 disclosure.  The remaining 306 days, comprising nearly 75% of the total Class Period, occurred *after* September 9, 2021.  It is thus probable that a majority of Class members, like Mailey, purchased Humanigen securities after September 9, 2021.  Greenbaum's readiness to take a position at odds with the interests of so many Class members merely to secure a leadership role in this litigation calls into question his own fitness to serve as a Class fiduciary, which would require him to place the Class's interests above his own.  *See Eichenholtz v. Verifone Holdings, Inc.*, 2008 U.S. Dist. LEXIS 64633, at *2 (N.D. Cal. Aug. 22, 2008) (finding it "unclear why a plaintiff would argue for" a more restricted class definition "unless it was in the best interest of that particular plaintiff only" because "no benefits accrue" by restricting the class definition).

Indeed, the timing of Mailey's Humanigen investments actually make him better suited than Greenbaum to represent the Class in this litigation. Mailey, unlikely Greenbaum, purchased Humanigen securities before, and held the securities through, **both** of the alleged corrective disclosures. Accordingly, Mailey was harmed as a result of both disclosures, meaning that he will be incentivized to pursue recovery of losses caused by both disclosure, thus benefiting all Class members, as opposed to only pursuing recovery of losses incurred in connection with one of the two disclosures. Greenbaum, by contrast, has already taken the position that the corrective disclosure of September 9, 2021 "is, by far, the most significant qualitative and quantitative corrective disclosure alleged" (Dkt. No. 14 at 3), which does not evince a readiness to vigorously advocate for the interests of investors injured by the second corrective disclosure of July 2022. *See Forescout*, 2020 U.S. Dist. LEXIS 217198, at *18 (finding "that the class would be best represented by lead plaintiffs who also purchased securities during the earlier portion of the class period" as well as during the later portion of the class period).

## II.    Mailey Did Not Employ "Atypical Investment Strategies"

Greenbaum further claims that Mailey is atypical because, given Mailey's attestation to "work[ing] in technology application support of a technology company in banking[,]" Greenbaum posits that Mailey must "routinely employ[] atypical investment trading strategies . . . *e.g.*, algorithmic trading." Dkt. No. 14 at 3.

10

Greenbaum's argument is the very definition of speculation and finds no support whatsoever in the record.  Mailey's employment in technology application support means that he works in the field of information technology ("IT") support—that is, providing support services to users of a technology company's products or services. Greenbaum's conclusion that Mailey must have used algorithmic trading strategies appears to be derived solely from the fact that the words "technology" and "banking" appear in the same sentence in Mailey's Declaration.  *See* Dkt. No. 9-3 at *31.  Nor has Greenbaum identified any aspect of Mailey's trading pattern that would be consistent with algorithmic trading strategies or otherwise support Greenbaum's puzzling conclusory assertion that "[t]his would explain why Mr. Mailey invested so heavily in Humanigen stock after the partial corrective disclosures in this case[.]" Dkt. No. 14 at 14.  Unsupported by "any substantiated allegation", Greenbaum's assertions about Mailey's purportedly atypical trading is precisely the type of speculation that courts in this Judicial District and the Third Circuit routinely reject. *Papa*, 2017 U.S. Dist. LEXIS 64264, at *13 (rejecting competing movant's "speculative" challenge to presumptive lead plaintiff, finding it unsupported by "any substantiated allegation").  *See also Roby v. Ocean Power Techs.*, No. 14-cv-3799 (FLW) (LHG) *et al.*, 2015 U.S. Dist. LEXIS 42388, at *10 (D.N.J. Mar. 17, 2015) ("the PSLRA requires 'actual proof' to rebut the presumption of the most adequate plaintiff.  'Mere speculation about a unique defense does not meet this standard.'")

11

(internal citations omitted) (quoting *OFI Risk Arbitrages v. Cooper Tire and Rubber Co.*, 63 F. Supp. 3d 394, 403 (D. Del. 2014)).

### III.   Mailey's Representation by Two Law Firms Is Irrelevant to His Adequacy

Finally, Greenbaum argues that Mailey's retention of two different law firms—Pomerantz, Mailey's proposal for Lead Counsel for the Class, and Schall, as additional counsel to Mailey—to represent him in this litigation is "problematic" because it "suggests that he will not be able to function as an active agent for the class." Dkt. No. 14 at 15 (internal quotations omitted). Not so. Courts routinely approve leadership structures in PSLRA actions involving two or more firms. *See*, *e.g.*, *Honeywell*, 2020 U.S. Dist. LEXIS 227046, at *8 (approving leadership structure comprised of two firms as co-lead counsel); *Energy Transfer LP*, 2020 U.S. Dist. LEXIS 27788, at *23-24 (same). Here, Mailey has sought the appointment of only one firm, Pomerantz, to serve as Lead Counsel. Schall, meanwhile, acts as additional counsel to Mailey and has advised him regarding the process of his participation in this litigation as a potential lead plaintiff and will continue to so as the litigation progresses. There is no reason why the retention of two law firms in non-overlapping roles would render Mailey inadequate under Rule 23 nor otherwise weigh against his appointment as Lead Plaintiff. Moreover, Mailey has submitted a Declaration in which he attests, under penalty of perjury, that "Pomerantz has been directed to prosecute this action in an efficient, cost-effective manner" and to

12

Mailey's preparedness to "supervise counsel and actively oversee the prosecution of the action for the benefit of the Class."  Dkt. No. 9-3 at *33-*34.  Greenbaum has given no reason that the Court should not credit Mailey's sworn attestation and instead accept Greenbaum's own baseless speculation, at odds with the record, that Mailey is unprepared to "function as an active agent for the class."  Indeed, the fact that Greenbaum's counsel, Levi & Korsinsky, LLP ("L&K"), routinely seeks to serve as co-lead counsel alongside other firms in PSLRA actions undercuts its assertions that the involvement of multiple law firms raises Rule 23 adequacy concerns.  *See*, *e.g.*, *Edge v. Tupperware Brands Corporation*, 6:33-cv-01518 (M.D. Fla.), Dkt. No. 29 (approving appointment of L&K and Pomerantz as co-lead counsel in PSLRA action); *Deputy v. Akebia Therapeutics, Inc.*, 1:22-cv-01411 (E.D.N.Y.) (same); *In re Grab Holdings Limited Securities Litigation*, 1:22-cv-02189 (S.D.N.Y.) (same).

## CONCLUSION

For the foregoing reasons, Mailey respectfully requests that the Court issue an Order granting his motion in all respects and denying the competing motions.

Dated:  November 14, 2022

Respectfully submitted,

POMERANTZ LLP

*/s/ Thomas H. Przybylowski*
Thomas H. Przybylowski
Jeremy A. Lieberman
(admitted *pro hac vice*)

13

J. Alexander Hood II
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com

*Counsel for Movant Joshua Mailey and Proposed Lead Counsel for the Class*

THE SCHALL LAW FIRM
Brian Schall
(*pro hac vice* application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Movant Joshua Mailey*

14